IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESTER DOBBEY (#R-16237), | Case No. 1:13-cv-01068 |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | Hon. Robert M. Dow, Jr. |
| MICHAEL STUDER, et al., | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff, Lester Dobbey, complains against Defendants Michael Studer, Marcus Hardy, Michael Lemke, John Lutzinger, James Louch, Troy Johnson, and John Does One through Ten, and states as follows:

### NATURE OF ACTION

1.     This is a civil action brought pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, to seek monetary, declaratory and injunctive relief under 42 U.S.C. § 1983, and to redress deprivations of Plaintiff's Civil Rights which were precipitated by the unlawful cruel and unusual punitive acts and omissions of the Defendants, all while purporting to act under the color of law.

### JURISDICTION AND VENUE

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(a)(3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201, 2202 and 2284.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), in the United States District Court for the Northern District of Illinois, because the facts giving rise to the claims in this Complaint occurred in this district.

## PARTIES

4.      Plaintiff, Lester Dobbey, is an inmate in the custody of the Illinois Department of Corrections, housed at Stateville Correctional Center, Register No. #R-16237, P.O. Box 112, Joliet, Illinois 60434, in Will County.

5.      Defendant, Michael Studer, is the current Water Supply Operator of Stateville Correctional Center and is legally responsible for the overall protection of Stateville's water supply, as well as the maintenance and sanitation of the water supply. Defendant Studer was the Water Supply Operator of Stateville Correctional Center while Plaintiff was in custody there.  Defendant Studer is legally responsible for the overall protection of Stateville's water supply, as well as the maintenance and sanitation of the water supply.

6.      Defendant, Marcus Hardy, was the Warden of Stateville Correctional Center while Plaintiff was in custody there.  Defendant Hardy was legally responsible for the health, safety and sanitation of inmate living conditions.

7.      Defendant, John Lutzinger, was the Chief Engineer of Stateville Correctional Center while Plaintiff was in custody there.  Defendant Lutzinger was legally responsible for the overall institutional and housing unit's maintenance and sanitation.

8.      Defendant, James Louch, was the Chief Engineer of Stateville Correctional Center while Plaintiff was in custody there. Defendant Louch was legally responsible for the overall institutional and housing unit's maintenance and sanitation.

9.     Defendant, Troy Johnson, is the current Chief Engineer of Stateville Correctional Center. Defendant Johnson is currently legally responsible for the overall institutional and housing unit's maintenance and sanitation.

10.     Defendant, Michael Lemke, is the current Warden of Stateville Correctional Center. Defendant Lemke is currently legally responsible for the health, safety and sanitation of inmate living conditions.

11.     Defendants, John Does One through Ten, are employees of the Stateville Correctional Center. The identities of these Defendants are presently unknown to Plaintiff. As the identities become known, their proper names will be added. These Defendants are sued in their individual capacity. At all times relevant to this action, these Defendants acted under color of law and acted deliberately indifferent to the Stateville Correctional Center prison conditions that are inadequate and hazardous to inmates/Plaintiff's health.

## CLASS ACTION ALLEGATIONS

12.     In addition to his individual claims, Plaintiff brings his claim for prospective relief under the Due Process Clause of the Fourteenth Amendment on behalf of approximately 1,700 inmates, all of whom were housed in Stateville Correctional Center during the filing of Plaintiff's Complaint.  A class action is proper pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

13.     The Class in this matter should be defined as all individuals incarcerated at the Stateville Correctional Center at any time since January 1, 2011, and all individuals who will be housed at the Stateville Correctional Center in the future." This Class excludes all individuals

incarcerated at the Northern Reception and Classification Center as well as all other facilities operated by the Illinois Department of Corrections.

14.     The class is so numerous that joinder is impracticable. On information and belief, there are approximately 1,700 members of the class.

15.     There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. Here, Plaintiff challenges the inadequate prison conditions of the Stateville Correctional Center.

16.     Plaintiff's claims are typical of the claims of the class.

17.     Plaintiff can fairly and adequately represent and protect the interests of the absent class members.

18.     Separate injunction and declaratory actions maintained by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, thereby establishing incompatible standards of conduct for the defendants. Adjudication regarding individual class members would, as a practical matter, be dispositive of or impair the interests of other members not parties to the adjudication or substantially impair their ability to protect their interests.

19.     Defendants have acted or refused to act on grounds generally applicable to the class that plaintiffs represent, thereby making final injunctive or declaratory relief appropriate for the class as a whole.

20.     The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT 1 – UNSANITARY BIRDS & VERMIN

21.     Stateville Correctional Center has had an extensive history of unsanitary birds and vermin within the inmates' living units, as well as in the inmates' dietary/kitchen.

22.     Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson have known of these issues and/or problems for several years without attaining comprehensive remedial measures to adequately address and subdue the unsanitary birds and vermin.

23.     Plaintiff has on numerous occasions complained to Stateville officials regarding the wild birds living and nesting in Stateville's Bravo House, where the birds would be allowed to fly freely throughout the living unit dropping bird feces wherever the birds please, while simultaneously chirping and/or singing very loudly in the early morning hours.  (See Exhibits A and B.)

24.     Plaintiff filed his initial complaint/grievance regarding these unsanitary birds on September 11, 2008, where Stateville Correctional Center maintenance , allegedly had on their "To Do List" and/or list of repairs, where the screens and windows were supposed to be fixed to alleviate the infestation of wild birds entering into the living units.  (See Exhibit B.)

25.     The wild birds carry various communicable diseases, through the bird itself, as well as bird feces, such as bird flu, fungi, lice, mites, parasites, spores and various toxins, all of which can cause varying human bodily injury.  (See Exhibit C.)

26.     The large population of birds that were living in Bravo House, where Plaintiff lived, presents a disease risk.  The most serious health risk arises from disease organisms that grow in the accumulations of bird droppings.  (See Exhibits A, B, and C.)

27.     There are several fungal diseases from bird droppings, such as:

(a)  Histoplasmosis:  Histoplasmosis is caused by a fungus.  The disease is transmitted to humans by airborne fungus spores from droppings of birds.  (See Exhibit C.)

(b)  Psittacosis:  Psittacosis is a rare infectious disease that affects various birds.  When bird droppings dry and become airborne, people may inhale them and get sick.  In humans, this bacterial disease is characterized by fatigue, fever, headache, rash, chills, and sometimes pneumonia.  (See Exhibit C.)

(c)  Allergic Alveolitus:  Allergic Alveolitus can be contracted by people, by inhaling particles of bird dander in the air.  (See Exhibit C.)

(d)  Avian Influenza:  Avian Influenza is transmitted through coming into contact with the fecal matter of infected birds.  (See Exhibit C.)

(e)  Campylobacteriosis:  Campylobacteriosis is a bacterial infection that causes gastrointestinal problems.  (See Exhibit C.)

28.  Plaintiff avers that he has suffered from fatigue, fever, headaches, chills and gastrointestinal bacterial infections, which Plaintiff vividly expresses below, in Count 7 of this Complaint.  (See Exhibit K.)

29.  Plaintiff further avers that he has suffered annoyance, as well as the deprivation of peace-of-mind, where Plaintiff would experience every morning for months, birds chirping and singing in his cell and/or on the gallery while fighting over food or territory.  (See Exhibit B.)

30.  The birds would annoy and irritate Plaintiff by awakening him at 3:00AM – 4:00AM, with their fighting, chirping and singing, which infringed upon Plaintiff's sleep and

adequate restoration of his body. The excessive noise would have Plaintiff tossing and turning for hours throughout many nights. (See Exhibits B and D.)

31.    Plaintiff also avers that Bravo House has a vermin infestation that is not controlled at all, where mice roam in and out of inmates' cells regularly and on a daily basis. (See Exhibit D.)

32.    Plaintiff has had mice in his cell, where the mice have eaten his commissary-bought food, which was stored properly in his personal property boxes. The mice have also eaten through and created holes in Plaintiff's state-issued clothes, as well as his commissary bought clothes. (See Exhibit D.)

33.    There are mass infestations of roaches and spiders, as well as other bugs that are in inmates' cells, where not often, bug spray is sprayed along the walls and outer perimeters of inmate cells, and not in the inmate cells per se, which does not alleviate the problem. Rather it allows the bugs to further nest and breed in a secure area of the cell for them. (See Exhibit D.)

34.    Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson are well aware of the hundreds of inmates' complaints that have been made regarding the birds and vermin, but have failed to correct any.

## COUNT 2 – UNBEARABLE LIGHTING

35.    Stateville's Bravo House has approximately fifty (50) extra-large fluorescent light fixtures along the building wall and/or ceiling that brightly illuminate the building. (See Exhibit D.)

36.     These fluorescent lights remain on and fully illuminated 24 hours a day, 7 days a week, making it nearly impossible to retain proper sleep, with the excessive shine in Plaintiff's face throughout the night time.  (See Exhibit D.)

37.     Defendants Hardy and Lemke have heard the hundreds of complaints regarding the excessive shining fluorescent lights throughout the nighttime, and have refused to allow a dimmer to be set in place to help alleviate the many cries of annoyance.  The dimming of approximately fifty (50) fluorescent lights does not pose a threat to the safety or security of the institution, where the inmates in the living unit on the 11:00PM to 7:00AM shift are all properly secured in their cells, and light still would be on.

38.     It is believed that Defendants Hardy and Lemke have maintained this excessive shining of the fluorescent lights as a deliberate aggravator to inmates as to inflict punishment.

## COUNT 3 –
## UNSANITARY CELLS AND HAZARDOUS SHOWERS, FOOD CARTS AND CEILING

39.     Many of the individual cells at Stateville are dirty and unsanitary, where adequate cleaning supplies are not distributed daily and/or on a regular basis to maintain cleanliness.  (See Exhibit D.)

40.     Dust is one of the most produced elements in any household, but the amount of dust that is produced on a day-to-day basis is overwhelming.  Whereas the amount of dust and dirt flowing from cell-to-cell has produced dust mites, which tend to reproduce by the millions.  (See Exhibits D and E.)

41.     The failure to provide adequate cleaning supplies, where the cells are dirty on the walls and floor, creates breeding grounds for dust mites, as well as other disease-causing micro-organisms.  (See Exhibits D and E.)

42.     When there is an attempt to supply inmates with an opportunity to wipe down their walls or mop their floors, the towels and/or rags provided are themselves universally nasty, just as well as the mops provided, where there are twenty-nine (29) cells on a gallery and there is one mop bucket of water for all the cells to use, without a change of water for lack of the disinfects, the same for the towel buckets.  Then after the mops are used, they are not washed; rather, they are just put in a room to dry for the next usage.  (See Exhibit D.)

43.     On a daily basis, a cell house is provided with one crate containing three (3) spray bottles and one (1) can of Ajax.  This is not sufficient for the approximately one hundred forty-five (145) individual cells housed by two (2) inmates, the inmate shower, the sergeant's office, the lieutenant's office, counselor office, and the major's office, as well as the main floor, all of which is one living unit.  (See Exhibit D.)

44.     And, through this supply of inadequate cleaning supplies, millions of these micro-organisms live and continue to breed, such as the dust mites.  These dust mites, in Bravo House, provide through the fecal substances, when inhaled or touched by skin, a list of typical symptoms, such as:  (See Exhibits D and E.)

> (a)     Hay fever;
>
> (b)     Watering eyes;
>
> (c)     Runny nose;
>
> (d)     Sneezing;
>
> (e)     Asthma, difficulty breathing;

(f)     Infantile eczema;

(g)     Itchy, red or watery eyes;

(h)     Nasal congestion;

(i)     Itchy nose, roof of mouth or throat;

(j)     Post-nasal drip;

(k)     Cough;

(l)     Facial pressure and pain;

(m)     Frequent awakening; and

(n)     Swollen, blue-colored skin under your eyes.

Poor ventilation makes these symptoms worse.  (See Exhibits D and E.)

45.    Plaintiff avers that he has suffered many of the aforementioned symptoms due to these dust mites.  (See Exhibit K.)

46.    Hundreds of inmates at Stateville have continuously made Defendants Hardy and Lemke aware of the lack of cleaning supplies issued, and still have not taken any corrective measures to subdue the filthy and unsanitary cells.  (See Exhibit D.)

47.    Hundreds of inmates at Stateville have continuously made Defendants Hardy and Lemke aware of how the inmate showers in the living units are hazardous, where behind the bath tile and/or cracked and exposed bath tiles, are colonies of toxic green, white and black molds.  (See Exhibits D and F.)

48.    The side effects of toxic mold on a human being's health are lengthy.  The most dangerous side effects include chronic delayed reactions, and these result from almost daily exposure building up over time and can range from neurological damage to the risk of cancer from exposure to certain mold toxins in the air and water.  (See Exhibits D and F.)

49.　Again, Defendants Hardy and Lemke have not attempted to seriously kill the mold growth in the inmate showers.

50.　Hundreds of inmates, as well as various Stateville staff, have continuously made Defendants Hardy and Lemke aware of how the roofing in Bravo House is hazardous, where whenever it naturally rains, the roof leaks massively, to the point blockades of buckets and trash cans have to be lined up to attempt to catch this water, where even then puddles of water still accumulate on the main floor of the building. (See Exhibit D.)

51.　The water leaks within the ceiling are in various buildings around Stateville, where a massive amount of mold is produced as well. Roofs that leak include:

   (a)　Bravo House;

   (b)　Charlie House;

   (c)　Delta House;

   (d)　Edward House;

   (e)　Frank House;

   (f)　Law Library;

   (g)　School building;

   (h)　Clothing room;

   (i)　Commissary room;

   (j)　Personal property room;

   (k)　Gym room, etc.

The roofs of all of these buildings have had accidental falls by inmates and staff.In some buildings, layers upon layers of mold are located within the ceilings. (See Exhibit D.)

11

52.     Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson knew of these hazards throughout all these buildings; however, they have not made any real attempts to fix these leaks and mold problems.

53.     Defendants Hardy and Lemke have been made well aware of the lead-based paint in inmate cells, as well as on the building walls, which are at times exposed through scrapings of paint off the various walls, which turns into dust and airborne.  (See Exhibits D and G.)

54.     Plaintiff has lived in various cells within Stateville that have had layers of 30-35 year old paint with lead in them. Every so often, the lead paint is just painted over and over without neutralizing the lead paint substances in the old lead paint.  (See Exhibits D and G.)

55.     Lead exposure can occur by way of ingestion of lead dust through normal hand-to-mouth contact, during which people swallow lead dust dislodged from deteriorated paint or leaded dust.  Lead exposure causes nervous system damage, as well as  kidney damage. It affects every organ system of the body.  (See Exhibits D and G.)

56.     Plaintiff avers that the he has suffered kidney problems, as well as other organ effects since his housing at Stateville which he vividly expresses below, in Count 7 of this Complaint.  (See Exhibit K.)

57.     Defendants Hardy and Lemke have not attempted to combat any of the lead-based paint with the removal thereof.  (See Exhibit D.)

58.     Defendants Hardy and Lemke have well been made aware of the Bravo House inmate food carts being unsanitary, where bird feces droppings lie on them, as well as roaches and other insects live in the wood carts. Despite these conditions, the inmate food is

still delivered on them. Further, they are used for food service and then trash pickup. (See Exhibit D.)

59.     These food carts "are not" often cleaned with disinfectant and/or bleach, and the dirt and bird droppings build-up are like cakes in some of the carts' corners, and they are still used for food service. (See Exhibit D.)

60.     Defendants Hardy and Lemke have failed and/or refused to provide sanitary food carts for inmates to receive their food on. (See Exhibit D.)

## COUNT 4 – INADEQUATE VENTILATION

61.     The ventilation at Stateville has been inadequate and hazardous for many years, despite Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson being aware of this. (See Exhibit D.)

62.     The air circulating around the Bravo House and individual cells consist of ions that are thick with dust, hair, pest and bird dander, airborne viruses, and wool fibers from state-issued blankets. (See Exhibit D.)

63.     The circulation of this type of air has been a constant assault of the Plaintiff's respiratory system, thereby making it hard for him to breathe properly. It has caused various allergic and irritable reactions. (See Exhibit D.)

64.     The vents in numerous cells are covered with steel plates preventing any air circulation. Despite Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson being aware of all these inadequate ventilation issues, they have failed to make corrective measures for clean air. (See Exhibit D.)

## COUNT 5 – INADEQUATE HEATING IN SUB-ZERO TEMPERATURES

65.    Stateville has had a constant problem within the housing units/Bravo House with inadequate heating during the cold and winter months, which Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson have been made aware of by the hundreds of inmates' complaint.  Heat units remain broken, as well as several broken windows.  The doors also remain open for lengthy time periods.  (See Exhibit D.)

66.    During the February 2011 blizzard, Plaintiff as well as other inmates in Bravo House suffered extremely freezing temperatures where many days and/or weeks temperatures were either in single digit numbers and/or below zero numbers, and the heating units did not work.  (See Exhibits D and H.)

67.    These freezing sub-zero temperatures entered into the Bravo House through several broken windows, and where the catwalk/gun tower officers would leave windows and the catwalk door open. Inmates  have continuously hollered and screamed for hours to attempt to have the officers close either the windows or door and/or both.  (See Exhibit D.)

68.    Plaintiff avers that he was issued certain basic clothing which included two (2) blue pants, two (2) blue shirts, as the everyday uniform attire for inmates, two (2) pairs of socks, two (2) t-shirts, two (2) pairs of underwear, one (1) cap, one (1) not-so-thick insulated coat, and two (2) sheets.  Plaintiff was not issued long johns/thermal wear because such clothing is only provided to institutional workers.  (See Exhibit D.)

69.    Plaintiff further avers that the clothing issued to him was insufficient to combat blizzard/sub-zero temperatures during the February 2011 blizzard.  Plaintiff was not issued a state blanket during these times, where the Bravo House building would feel like a deep freezer.  (See Exhibits D and H.)

14

70.     To attempt to combat the February 2011 blizzard, Plaintiff borrowed certain clothing items from his cellmate and neighbors. Plaintiff had to put on one (1) long john bottom, three (3) long john tops, two (2) state blue pants, two (2) t-shirts, two (2) sweat pants, two (2) sweat shirts, one (1) state coat, one (1) skull cap, and three (3) bed sheets. Nevertheless, Plaintiff still remained freezing cold with slight tremors, while remaining balled up in his bed. (See Exhibits D and H.)

71.     Plaintiff would ask the cell house staff for blankets and was told constantly that there were no blankets available. (See Exhibit D.)

72.     The February 2011 blizzard/winter storm impacted almost the entire State of Illinois. Various counties reported record or near record snowfall accumulations ranging from 10 to 18 inches with isolated 20 inch totals. The wind gust was 50 to 70 miles per hour, which created snow drifts more than 7 feet high. (See Exhibit H.)

73.     The Governor issued a disaster declaration nearly 24 hours prior to the onset of the blizzard/storm. (See Exhibit H.)

74.     Temperatures through February 2011, averaged 1 to 2 degrees below normal, where the coldest stretch of weather was from the 2nd to the 4th, and from the 8th to the 10th, when temperatures dipped into the single digits and below zero in many locations. And one can only imagine an all concrete and steel building that stands approximately six (6) stories high, approximately 200 feet long, and approximately 25-30 feet wide, how it felt without functioning heat. It was freezing and intolerable both night and day. (See Exhibits D and H.)

75.     Plaintiff also avers that although every year during the cold and winter months there may be no blizzard, these cold conditions have remained a problem in Bravo House for

several years. Despite Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson knowing about these conditions, they have failed to fix, where temperatures regularly maintain at 40 degrees or below at times, during the months of November through February and March. (See Exhibits D and H.)

76.     These freezing sub-zero temperatures have made Plaintiff's regular daily activities impermissible, such as studying religious materials, as well as criminal and civil law, writing, and just simply standing up in the cell for any long period of time. Several work orders were allegedly filed with Defendant Louch to have the heating units fixed, but Defendants Louch and Johnson have failed to fix them. (See Exhibit D.)

## COUNT 6 – INADEQUATE/CONTAMINATED WATER SUPPLY

77.     Stateville has had a bad history of supplying inadequate/contaminated water to its employees and inmate residents, where hundreds of inmates have continuously complained of these issues to the administration of Stateville and/or Illinois Department of Corrections.

78.     Defendant Studer, as the water supply operator, has known of this problem for many years, even before Defendant Hardy; nevertheless, despite having knowledge of the inadequate and/or contaminated water supply, Defendants Hardy, Lemke, and Studer have failed to correct these problems. (See Exhibits D, I and J.)

79.     The inadequate/contaminated water supplied at Stateville is for inmate drinking and for the cooking of all foods prepared by the Dietary /Kitchen. (Exhibits D, I and J.)

80.     This inadequate/contaminated water supply consists of excessive amounts of microbial contaminants, such as viruses and bacteria, inorganic contaminants, such as salts and metals, pesticides and herbicides, such as various water runoffs, organic chemical contaminants, including synthetic and volatile organic chemicals, which are byproducts of industrial processes and petroleum production, and radioactive contaminants. (See Exhibits D, I and J.)

81.     One specific contaminant in Stateville is radium, which, when water containing combined radium is ingested, a portion of the radium may remain in the bone. And the radiation which is given off from the radium due to its high energy, can cause damage to the surrounding tissue. And, a dose of 5 pC:/1 ingested over an extended period of time may result in the development of bone cancer. (See Exhibits D, I and J.)

82.     Another contaminant in Stateville is Alpha Emitters, which are erosions of natural deposits, and is also a cancerous element. (See Exhibits D, I and J.)

83.     Stateville does not have a cross-connection control program approved by the Illinois Environmental Protection Agency. And, Defendant Studer has not assured that all the backflow devices are tested on an annual basis. Defendants Hardy and Lemke have not assured testing either. (Exhibit I.)

84.     Stateville supply water, contaminated with exceeding levels of lead and copper and unisolated softener (TP04), has produced stagnant and contaminated water entering the distribution. (See Exhibit I.)

85.     Defendants Studer, Hardy, and Lemke knew that Stateville had a supply which had a water softener which was not being used, in which the stagnant water and/or the unused filter media inside the softener allowed harmful bacteria breeding and distribution to

17

Plaintiff, as well as Bravo House inmates. (See Exhibit I.) Defendants Studer, Hardy, and Lemke have failed to fix the problem.

86.　　These same bacteria and contaminants are utilized by the Stateville Dietary in the preparation of foods and drinks, that are consumed on a daily basis by Plaintiff, as well as all the other inmates. These bacteria and contaminants have caused Plaintiff to suffer various ailments, where since Plaintiff's arrival at Stateville in the year of 2007 to the present, Plaintiff's health has gradually deteriorated, which Plaintiff vividly expresses below, in Count 7 of this Complaint. (See Exhibits D, I, J, and K.)

## COUNT 7 – PLAINTIFF'S HEALTH DETERIORATES

87.　　In March 2007, Plaintiff was transferred from Menard Correctional Center to Stateville Correctional Center for unrelated matters, where Plaintiff was a healthy young man upon his arrival at Stateville. (See Exhibit K.)

88.　　After approximately one and a half years at Stateville, Plaintiff began to experience gastrointestinal problems, where he maintained abdominal pains for multiple years, blood in his stool, and intestinal bacterial infections. (See Exhibit K.)

89.　　After approximately four years at Stateville, Plaintiff began to have gastrointestinal, as well as kidney problems, where Plaintiff has experienced ongoing kidney complications for approximately one and a half years. (See Exhibit K.)

90.　　After approximately five and a half years at Stateville, Plaintiff began suffering from liver problems. (See Exhibit K.)

91.　　Plaintiff was initially admitted to the Illinois Department of Corrections in October 2002, which he first came to Stateville for intake where he was housed in a

condemned H-House building for approximately two (2) weeks He was then transferred to Menard.  (See Exhibit K.)

92.     Plaintiff was healthy while living at Menard for the several years there.  (See Exhibit K.)

93.     Plaintiff went on a writ to Court, from Menard in December 2004, where Plaintiff was transferred to Stateville's writ/segregation unit ("F-House"), where he was placed in a condemned cell F#324.  The Circuit Court of Cook County remanded Plaintiff to Cook County Jail, on February 10, 2005, where Plaintiff remained up until August 2005.  Plaintiff still was considered healthy.  (See Exhibit K.)

94.     In August 2005, Plaintiff was sent back to Stateville's Northern Receiving Center ("NRC") for about one week. Then Plaintiff was sent back to Stateville's "F-House", where he remained until September 2005.  Plaintiff was then transferred back to Menard in September 2005, where he remained until March 21, 2007, where Plaintiff still was considered healthy.  (See Exhibit K.)

95.     From March 2007 to present, Plaintiff's health aggressively deteriorated and continues to deteriorate on a day-to-day basis.  And although he receives treatments, whether adequate or inadequate for his ailments, he is no longer considered the healthy young man since being housed at Stateville.

96.     Stateville will never admit to any wrongdoing no matter what type of evidence that is produced against them, or even those inadequate or hazardous things that they know of.  Stateville will still try to find a way to manipulate facts, to steal state money, and for its employees to do the least amount of work possible, while receiving "full pay-checks" and

"unnecessary-overtime pay-checks."  Stateville's administration is a master manipulator that deceives the public.

## COUNT 8 – INMATE LIVING UNITS HAZARDOUS AND UNSAFE FOR HUMAN OCCUPANCY

97.     Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson have known for years that various buildings of Stateville have been hazardous, including but not limited to, the inmate living units which are unsafe for human occupancy.  (See Exhibits L, M, N, and O.)

98.     The inmate living units (Bravo, Charlie, Delta and Edward) continuously pose a substantial risk of imminent personal injury and/or death of Plaintiff, as well as all the other inmates who live in these units.  (See Exhibits L and M.)

99.     The living units known as "Bravo House, Charlie House, Delta House, and Edward House," consist of only one individual building; however, they are separated and/or divided into four (4) living units.  (See Exhibits L and M.)

100.    The "Bravo, Charlie, Delta and Edward Building" is unsafe for human occupancy where the building poses a substantial risk of a complete collapse and/or a partial collapse of the overall building's structure.  Still, Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson have failed to correct the great pose of danger.  (See Exhibits L and M.)

101.    Plaintiff is currently housed in Bravo House, which is unsafe for human occupancy due to the substantial risk of complete and/or partial collapse of the existing unsafe conditions of the building.  (See Exhibits L and M.)

102.    The structure of the Bravo, Charlie, Delta, and Edward Building consists of a brick building which is supported by and surrounded by "sixty-four (64) support columns,"

and is founded by a cement mixture, which establishes the "foundation slab." The support columns are over five (5) stories high, which connect approximately from the foundation slab and/or the main floor up to the building's roof. (See Exhibits L and M.)

103.   All sixty-four (64) support columns are visibly noticeable, in plain sight, as having deteriorating bricks with multiple cracks from the foundation slab and/or main floor extending all the way up to the roof, which is over five (5) stories high, which threatens to "crumble and/or break away" from its intended structure, placing Plaintiff as well as other inmates and staff at a great substantial risk of imminent personal injury and/or death on a daily basis. (See Exhibits L and M.)

104.   Not only are all sixty-four (64) support columns cracked from the bottom to the top, but "the wall of bricks" between various support columns are also cracked with deteriorating bricks and/or stones which crumble and break away, where it can, in plain view, be seen with approximately one (1) inch gaps and/or spaces with no filler and/or cement. (See Exhibits L and M.)

105.   By the inmate living units ("Bravo, Charlie, Delta, and Edward House") being founded on a deteriorating foundation, which has cracks in the support columns and the main floors, it has caused the "entire building structure" to "shift-off" and "lean slightly," thereby posing a substantial risk of imminent personal injury or death. And, despite Defendants Lutzinger, Louch, Hardy, Lemke, and Johnson having known this, they have failed to correct these issues.

106.   Several other structures around Stateville also have deteriorating foundations and walls that need to be fixed.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

107.    Plaintiff filed a grievance with his counselor, Karen Rabideau, on September 11, 2008, where she responded on September 24, 2008.  This is the first step in exhaustion. (See Exhibit B.)

108.    Plaintiff appealed his September 11, 2008 grievance, to Grievance Officer Margaret Thompson, who responded on September 29, 2008.  Warden Terry L. McCann also responded on September 30, 2008.  This is the second step in exhaustion.  (See Exhibit B.)

109.    Plaintiff appealed his September 11, 2008 grievance to ARB Chairperson Jackie Miller, who responded on February 13, 2009.  Director Roger E. Walker Jr. responded on March 23, 2009.  This is the third and final step in exhaustion.  (See Exhibit B.)

110.    On February 25, 2011, Plaintiff filed a grievance to his counselor, Cleo Johnson, who responded on March 3, 2011.  This is the first step in exhaustion.  (See Exhibit J.)

111.    Plaintiff appealed his February 25, 2011 grievance to Grievance Officer Anna McBee, who received the grievance on March 11, 2011, then responded to the grievance on April 4, 2012.  Warden Marcus Hardy responded on April 13, 2012.  This is the second step in exhaustion.  (See Exhibit J.)

112.    Although Plaintiff appealed his February 25, 2011 grievance to the Administrative Review Board, which is pending, and the third and final step in exhaustion, when Grievance Officer Anna McBee held the grievance over one year remedies became unavailable.  (See Exhibit J.)

113.    On March 20, 2011, Plaintiff filed a grievance to his counselor, Cleo Johnson, who responded on March 17, 2011.  This is the first step in exhaustion.  (See Exhibit D.)

114.    On August 29, 2011, Grievance Officer Anna McBee responded to Plaintiff's March 10, 2011 grievance.  Warden Marcus Hardy responded on August 30, 2011.  This is the second step in exhaustion.  (See Exhibit D.)

115.    On December 22, 2011, ARB Chairperson Jackie Miler responded to Plaintiff's March 10, 2011 grievance.  Director S.A. Godinez responded on January 3, 2012. This is the third and final step in exhaustion.  (See Exhibit D.)

## VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

116.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 115 of this Complaint.

117.    Plaintiff has rights protected under the 8th and 14th Amendments to the United States Constitution.  These rights include the right to be free from cruel and unusual punishment, due process and equal protection of laws.

118.    Plaintiff has exercised his constitutional protected rights to be free from cruel and unusual punishment, due process and equal protection of laws, by the filing of this law suit.

119.    As outlined above, Plaintiff has clearly exhausted his administrative remedies by filing his grievances through the prison's internal grievance procedure, as well as the department's grievance procedure.

120.    Defendant Michael Studer, current Water Supply Operator of Stateville, acting under the color of law, has violated the Plaintiff's Eighth and Fourteenth Amendment Protected rights to be free from cruel and unusual punishment, when Defendant Studer acted

23

deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to inmates/Plaintiff's health.

121. Defendant Marcus Hardy, Chief Administrative Officer and Warden of Stateville, acting under the color of law, violated Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Hardy acted deliberately indifferent to the Stateville prison conditions that are inadequate and hazardous to inmates/Plaintiff's health.

122. Defendant Michael Lemke, current Warden of Stateville, acting under the color of law, has violated current inmates' Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Lemke acted deliberately indifferent to the Stateville prison conditions that are inadequate and hazardous to inmates' health.

123. Defendant John Lutzinger, Chief Engineer of Stateville, acting under the color of law, violated Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Lutzinger acted deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to inmates/Plaintiff's health.

124. Defendant James Louch, Chief Engineer of Stateville, acting under the color of law, violated Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Louch acted deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to inmates/Plaintiff's health.

125.    Defendant Troy Johnson, current Chief Engineer of Stateville, acting under the color of law, has violated current inmates' Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Johnson acted deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to inmates' health.

126.    Defendants John Does One through Ten, past and present employees of the Stateville Correctional Center, acting under the color of law, have violated Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendants John Does One through Ten acted deliberately indifferent to the Stateville prison conditions that are inadequate and hazardous to inmates/Plaintiff's health.

127.    These prison officials have violated their duty and responsibility of protecting inmates/Plaintiff from these inadequate and hazardous prison conditions.

128.    These Defendants possess actual knowledge of the inadequate and hazardous conditions, and have impeded the preventable measures of harm.

129.    These Defendants possess the power to correct all of the inadequate and hazardous prison conditions Plaintiff has alleged in this Complaint, at any given time, with a posture of due diligence when evaluating job descriptions.

**CONCLUSION**

WHEREFORE, PLAINTIFF LESTER DOBBEY asks this Honorable Court for Judgment against Defendants, and states as follows:

A.)    A Declaration that the acts and omissions of Defendants violated Plaintiff's constitutional protected rights;

      B.)     A Permanent Injunction prohibiting Defendants in further deliberate indifferent acts against Plaintiff;

      C.)     Compensatory damages in the amount of Three Thousand Five Hundred ($3,500.00) Dollars, per each Defendant;

      D.)     Punitive damages in the amount of Eight Thousand Five Hundred ($8,500.00) Dollars, per each Defendant;

      E.)     Damages for physical and mental suffering in the amount of Three Thousand Five Hundred ($3,500.00) Dollars, per each Defendant;

      F.)     Plaintiff's costs and fees in prosecuting this action.

Date:   1/7/14

Respectfully submitted,

Harold V. Johnson
David M. Hanna
BRINKS GILSON & LIONE
NBC Tower, Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611-5599
Telephone: (312) 321-4200
Facsimile: (312) 321-4299

Attorneys for Plaintiff,
LESTER DOBBEY

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2014, a copy of the foregoing Amended Complaint was served as indicated below, and thereby served upon counsel for all Parties.

**Parties receiving service via the CM/ECF electronic filing system are as follows:**

Kevin Lovellette
Assistant Attorney General
General Law Bureau
100 W. Randolph, 13th Floor
Chicago, IL 60601
(312) 814-3720
klovellette@atg.state.il.us
*Attorneys for Defendants*

*Attorney for Lester Dobbey*