# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LESTER DOBBEY, et al.,

           Plaintiffs,

v.

WILLIAM WEILDING, et al.,

           Defendants.

Case No. 13-cv-1068

Hon. Andrea R. Wood

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Michael Kanovitz
Heather Lewis Donnell
Stephen Weil
Maria Makar
Loevy & Loevy
311 North Aberdeen, Third Floor
Chicago, Illinois 60607
Tel: 312-243-5900
Fax: 312-243-5902

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTS ...............................................................................................................1

I.      Structural Safety and Integrity of the Buildings, Most Importantly, the Quarter House, Put Class Members in Immediate Risk of Physical Harm ........................................................1

      A.     The Court's Expert and IDOC's Expert Agree that Immediate Repairs to the Quarter House are Necessary to Ensure Class Member Safety .............................2

           1.     The Quarter Houses Have Significant Structural Vulnerabilities...............2

           2.     Due to IDOC's Lack of Action, Concrete Fell from the Window Lintel Near the Ceiling of E-House in August 2023 ...............................................6

           3.     All the Window Lintels in the Four Cell Blocks of the Quarter House Create a Risk of More Falling Concrete .....................................................6

           4.     The Quarter House Continues to Deteriorate and Suffer Water Infiltration ................................................................................................7

           5.     Gymnasium is out of service..........................................................................8

           6.     The Kitchen and Dietary Building Need Immediate Repairs .....................8

      B.     The CGL Report Confirms Stateville Must Close....................................................8

      C.     IDOC Does not Dispute The Significance of the Structural Issues at Stateville .....9

II.     Other Conditions Pose Serious Health and Safety Risks to Class Members....................10

III.    The Conditions Present and Immediate Risk to Class Members .......................................11

IV.   Defendants' Response has been Inadequate Response .....................................................12

V.    Class Members Need Immediate Relief ...........................................................................14

## TABLE OF CONTENTS – CONT.

LEGAL STANDARD ...................................................................................................15

ARGUMENT ...............................................................................................................16

I.     Class Members Can Demonstrate a Reasonable Likelihood of Success on the Merits .....17

     A.     Deliberate Indifference Requires Showing of Awareness of a Risk and an Unreasonable Response to that Risk ....................................................................17

     B.     Class Members Are Reasonably Likely to Succeed on their Eighth Amendment Claim ...........................................................................................................20

II.     The Class Members Have No Adequate Remedy at Law for the Severe Risk of Injury or Death They Continue to Face ...........................................................................24

III.     The Class Members Face Irreparable Harm, Including Death, Absent Temporary and Preliminary Relief ...........................................................................................25

IV.     The Harm Threatening Class Members Outweighs Any Harm to Defendants .................26

V.     A Preliminary Injunction in Favor of Class Members Would Serve the Public Interest ...27

VI.     This Court Should Not Require Class Members to Provide Security Prior to Issuing a Temporary Restraining Order ............................................................................28

CONCLUSION ...........................................................................................................29

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843 (N.D. Ill. 2019)................15

*Basank, P.G. ex rel. K.G. v. Hamos*, 2013 WL 393233 (C.D. Ill. Jan. 31, 2013) ....................... 28

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 82 (7th Cir. 1998) ............................24

*Brown v. Plata*, 563 U.S. 493 (2011)...........................................................................................16

*Cody v. Hillard*, 799 F.2d 447, 449-50 (8th Cir. 1986) ................................................................ 18

*Cole v. Coller*, 2017 WL 3049540 (S.D. July 19, 2017) .............................................................27

*Cruz v. Beto*, 405 U.S. 319 (1972)............................................................................................... 16

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ........................... 18, 19

*Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997)....................................................................17, 23

*EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840 (N.D. Ill. 2001) .................................... 25

*Famous v. Pollard*, 2008 WL 152926 (E.D. Wis. Jan. 11, 2008)................................................ 19

*Farmer v. Brennan*, 511 U.S. 825 (1994) .................................................................................... 17

*Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009).....................................................24, 25, 27

*Foster v. Ghosh*, 4 F. Supp. 3d 974 (N.D. Ill. 2013) ............................................................. 16, 25

*Frullari Franchise Sys., Inc. v. Dana Areece & Co.*, 2001 WL 743427
    (N.D. Ill. June 28, 2001) ......................................................................................................15

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079
    (7th Cir. 2008)..................................................................................................................... 25

*Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016) ............................................................................19

*Green River Bottling Co. v. Green River Corp*, 997 F.2d 359 (7th Cir. 1993)............................15

*Gregory v. Davis*, 2015 WL 128061 (S.D. Ill. Mar. 18, 2015).................................................... 18

*Helling v. McKinney*, 509 U.S. 25 (1993)........................................................................ 17, 18, 23

## TABLE OF AUTHORITIES – CONT.

*Henderson v. Butler*, 2015 WL 6746581 (S.D. Ill. Nov. 5, 2015)................................ 20

*Hoosier Energy Rural Elect. Co-op, Inc. v. John Hancock Life Ins. Co.*, 583 F.3d 721
    (7th Cir. 2009)..........................................................................................15

*Hutto v. Finney*, 437 U.S. 678 (1978)..........................................................16

*Isaac v. Cockrell*, 2018 WL 4679762 (E.D. Mich. Sept. 28, 2018)................................18

*James v. Milwaukee Cnty.*, 956 F.2d 696 (7th Cir. 1992)................................19

*Joelner v. Vill. of Washington Park*, 378 F.3d 613 (7th Cir. 2004)................................27

*Jones 'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wis. 2001)................................25

*Mays v. Dart*, 435 F. Supp. 3d 1074 (N.D. Ill. Apr. 9, 2020)........................................25

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ..........................................15

*Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765 (7th Cir. 2011) ......................................15

*Moore v. Smith*, 2021 WL 11716912 (M.D. Ga. Mar. 3, 2021) ....................................18

*Newsome v. Albemarle Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) ..................................27

*Knight v. Wiseman*, 509 F.3d 458 (7th Cir. 2009) ..........................................19

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020).........................................................25

*Plata v. Brown*, 427 F. Supp. 3d 1211 (N.D. Cal. 2013)........................................16

*Pocklington v. O'Leary*, 1986 WL 5748 (N.D. Ill. May 6, 1986)......................................28

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978)................................................25, 27

*Rhodes v. Chapman*, 452 U.S. 337 (1981)..........................................................18

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984)....................................26

*Roman v. Hileman*, 2018 WL 3045622 (S.D. Ill. June 20, 2018).........................................19

*Sardon v. Peters*, 1995 WL 609147 (N.D. Ill. Oct. 13, 1995) ......................................19

*Sherman v. Lane*, 1998 WL 11649 (N.D. Ill. Mar. 9, 1998)........................................19

## <u>TABLE OF AUTHORITIES – CONT.</u>

*Smith v. Clark*, 1992 WL 222603 (N.D. Ill. June 21, 1993) .........................................................19

*Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188 (7th Cir. 2013) .................................... 19

*Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020)................................................................. 27

*Teen v. St. Clair Cnty. Jail*, 2017 WL 3670164 (S.D. Ill. Aug. 25, 2017) ................................. 17

*Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) .................................................................19

*Thomas v. GEO Grp., Inc.*, 2022 WL 834333 (N.D. Ind. Mar. 21, 2022)....................................19

*Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891 (7th Cir. 2001) ............................................................15

*Valencia v. City of Springfield*, 883 F.3d 959 (7th Cir. 2018)......................................................26

*Valentine v. Collier*, 455 F. Supp. 3d 308 (S.D. Tex. 2020)........................................................27

*Vantile v. Collier*, 455 F. Supp. 3d 308 (S.D. Tex. 2020) ...........................................................28

*Watson v. City of Memphis*, 373 U.S. 526 (1963).......................................................................27

*Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680 (7th Cir. 2012) ....................................25

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) . 15, 23

*Williams v. Shah*, 927 F.3d 476 (7th Cir. 2019) ..........................................................................17

*Wilson v. Seiter*, 501 U.S. 294 (1991)......................................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................... 15

*Winters v. Hendrix*, 2023 WL 7553861 (N.D. Ill. Nov. 13, 2023) ...............................................20

*Young v. Ballis*, 762 F. Supp. 823 (S.D. Ind. 1990)....................................................................24

*Youngberg v. Romero*, 457 U.S. 307 (1982)............................................................................... 23

## TABLE OF AUTHORITIES – CONT.

Statutes:

18 U.S.C. § 3626(a)(1)(A) ........................................................................................16

Articles:

*Bruce Rauner, Gov. Rauner: In Name of Justice, I'm Closing Stateville's F House*,
    Chi. Sun Times (Oct. 14, 2016) ........................................................................3

Charles Truitt, *Stateville Correctional Center: Facility Data*, Ill. Dep't of Corr.,
https://idoc.illinois.gov/facilities/allfacilities/facility.stateville-correctional-center.html.. 1, 13-14

Ryan Woods, *Sheridan Correctional Center: Facility Data*, Ill. Dep't of Corr.,
https://idoc.illinois.gov/facilities/allfacilities/facility.sheridan-correctional-center.html..............14

## INTRODUCTION

Stateville Correctional Center ("Stateville") is uninhabitable. Recently, Class Members have narrowly missed injury from falling concrete. Experts in structural engineering agree that critical buildings are structurally unsound and in a state of disrepair that has required immediate attention for years. Illinois Department of Corrections ("IDOC") failed to make the necessary repairs and now concrete is falling from the walls and ceilings, putting Class Members in immediate risk of physical harm. IDOC has stated its plan to close and rebuild Stateville, but its plan has stalled. Class Members cannot wait for any further delay. IDOC must immediately transfer them out of Stateville.

Based on the facts set forth below, Class Members can easily satisfy their legal burden of demonstrating an Eighth Amendment violation to prove their likely success on the merits. There are no countervailing interests that outweigh Class Members' risk of harm. Indeed, Class Members' motion serves the public interest by protecting Class Members' health and safety and is consistent with IDOC's recommendation to close and rebuild Stateville. This motion seeks to but to ensure Class Members are transferred out of Stateville as soon possible before any unnecessary and preventable injuries or death to Class Members.

For the reasons set forth below, the Class respectfully requests that this Court grant its motion for preliminary injunction.

1

## FACTS

I. **Structural Safety and Integrity of the Buildings, Most Importantly, the Quarter House, Put Class Members in Immediate Risk of Physical Harm**

Stateville is nearly a century old. Approximately 420 Class Members reside there as of the filing of this motion.[1] And at issue in this Motion: all over the prison, ceilings, walls, windows, and support columns are cracked and crumbling—the result of age, neglect, and water infiltration—putting Class Members at an intolerable level of risk of physical harm. Occasionally, pieces of the building just fall down. Recently, concrete fell from the window lintel in one of the cell blocks of the quarter house where most Class Members reside. Other buildings are already condemned and shuttered.[2]

A. **The Court's Expert and IDOC's Expert Agree that Immediate Repairs to the Quarter House are Necessary to Ensure Class Member Safety**

Stateville is in a terrible state of disrepair. At two least structural engineering experts found that some of these deferred repairs were required "immediately", yet none of these significant structural repairs have been made to date. As a result, and as set forth below, Class Members face imminent risk to their physical safety.

1. **The Quarter Houses Have Significant Structural Vulnerabilities**

---

[1] IDOC's website reported a population at Stateville of 422 as of July 30, 2024. *See* Charles Truitt, *Stateville Correctional Center: Facility Data*, Ill. Dep't of Corr., https://idoc.illinois.gov/facilities/allfacilities/facility.stateville-correctional-center.html (last visited July 30, 2024).

[2] Lester Dobbey, a *pro se* litigant and resident at Stateville at the time, aimed to rectify these conditions. In 2013, Mr. Dobbey sought a preliminary injunction to repair the unconstitutional conditions at Stateville. Dkt. 1 at 43. He filed his first complaint on February 8, 2013, *id.*, and has filed two amended complaints. Dkt. 27 (First Amendment Complaint); Dkt. 34 (Second Amended Complaint). On January 23, 2024, the Court certified the Class: "[A]ll individuals incarcerated at the Stateville Correctional Center at any time since January 1, 2011, and all individuals who will be housed at the Stateville Correctional Center in the future." Dkt. 37 at 1-2.

First, in 2018, the Court granted Plaintiffs' motion for an appointed structural engineering expert. The Court appointed expert Bruce Kaskel to evaluate Stateville, pursuant to Federal Rule of Evidence 706. Dkt. 173. After touring the facility with Honorable Robert M. Dow, Class counsel, Defendants' counsel, and Stateville personnel, Mr. Kaskel prepared expert reports evaluating the facilities and identifying many areas that required emergency repairs.[3] Of particular concern were the vulnerabilities noted to structure and masonry of the quarter house, where most Class Members resided at that time.[4]

Mr. Kaskel observed that there were "numerous vertical cracks" in the brick masonry piers, which may "reduce the strength of the load-bearing piers." Exhibit 1 (Report of Bruce Kaskel dated October 30, 2019 ("Kaskel Report")) at 16. Inside the quarter house, Mr. Kaskel found "large cracks" in the load-bearing interior walls that needed further evaluation because these types of "[c]racks may reduced the support of decks that bear on these walls." *Id.* at 17. The Court's expert identified several areas needing repairs, including the large windows in the front wall between the masonry piers, the floors and ceilings of the two ground floor showers, and the roof truss. *Id.* at 18. He observed uneven floors and stairs that presented safety hazards, and noted that the service wall chase required additional inspection to identify why water was observable, through holes in the floor, running below the concrete floors.

---

[3]    Specifically, Mr. Kaskel evaluated the structural safety, including the roof, masonry, and interiors, of the quarter houses (a single, connected building structure made up of B-, C-, D-, and E-House), X-House, the kitchen, health services unit, the theater, the gymnasium, the personal property building, and the commissary. *See generally* Exhibit 1 (Kaskel Report). He identified, among others, the following areas as needing emergency repairs: the masonry, the gymnasium roof, and the showers in the quarter house *Id.*

[4]    Earlier in this litigation, F-House and its horrific conditions were part of this case until it was finally closed by Governor Bruce Rahner in November 2016. *See, e.g.*, Dkt. 34 at ¶51; Exhibit 3 (*Bruce Rauner, Gov. Rauner: In Name of Justice, I'm Closing Stateville's F House*, CHI. SUN TIMES (Oct. 14, 2016)), https://chicago.suntimes.com/2016/10/14/18404476/gov-rauner-in-name-of-justice-i-m-closing-stateville-s-f-house. F-House, referred to as the "round house," was the last panopticon by any state's penal system, until it was closed. Exhibit 3.

Following Mr. Kaskel's evaluation, the Defendants also retained an expert, Helen Torres & Associates ("HTA"). HTA evaluated the masonry of the quarter houses in the fall and winter of 2021 and finalized the Defendants' expert's report in January 2022. Exhibit 2 (Report of Helen Torres & Associates dated January 20, 2022 ("HTA Report")) at 2. The Defendants' expert agreed with Mr. Kaskel, and further identified additional concerns for the quarter houses.

IDOC's expert identified that there were "numerous elements" including the masonry walls, arches and the roof, that have failed as "a water barrier." Exhibit 2 (HTA Report) at 1. HTA reported that "masonry cracks present in and near the north and south arches [of the quarter house] require **immediate attention.**" *Id.* (emphasis added).

In addition, HTA reported that "wall cracking and top of wall cracking is present throughout the [quarter house] and requests repairs." Exhibit 2 (HTA Report) at 1. HTA further identified that "[a] few concrete lintels over large windows show signs of deterioration" and required assessment. *Id.* at 1. Water must be kept out of the masonry's exterior walls "to maintain the system's integrity." *Id.* at 7. HTA similarly found "[c]ondensate water" accumulating near the foundation wall, which has led it to crack and requires immediate repair. *Id.* at 7 tbl.1; Exhibit 2 (HTA) at 17 (noting that the existing cracks "currently provide a path for moisture migration behind the brick" and that there may be "other paths for moisture infiltration").

IDOC's expert highlighted in red items that HTA defined as requiring "immediate attention" because the "structural or non-structural deficiency . . . could adversely impact performance of [the] element if not addressed" and "[c]ould pose a falling debris hazard." Exhibit 2 (HTA Report) at 5. Six repairs received the red-level of "immediate action," which are excerpted from the HTA Report below:

4

| Repair Priority Level | Definition |
|---|---|
| High | Immediate action. Shore, brace or repair, as applicable. Structural or non-structural deficiency that could adversely impact performance of element if not addressed.  Could pose a falling debris hazard.  Restrict public access. |

| | | | |
|---|---|---|---|
| 1-3. Masonry Arches | South facade and North facade | South façade arch has a long continuous vertical crack on the underside of the arch for 80% of the arch's horizontal length.  There is evidence of falling brick spalls, loose mortar and efflorescence.  The interior wall of the arch has horizontal cracks indicative of downward movement/settlement. | 1-3 a -g |
| | | North façade arch has non-continuous vertical cracks on the underside of the arch for 50% of the arch's horizontal length.  There is evidence of falling brick spalls, loose mortar and efflorescence.  The interior wall of the arch has horizontal cracks indicative of downward movement/settlement. | 1-3 h -m |
| 1-4. Exterior wall opening steel lintels | In exterior walls above wall openings | Steel lintels have experienced oxide jacking (material rusts and expands) which has initiated failure of the adjacent face brick and mortar.  Typical in most steel lintel locations. | 1-4 a-d |
| 1-8 | Condensate line | Condensate water is accumulating near Pier E1 at the foundation wall.  The masonry wall and concrete foundation wall has cracking indicative of local foundation settlement. | 1-8 a, b |
| 2-3  North End Shower Room Conditions | Ceilings and floors | Both shower rooms exhibit distress in the ceiling framing and floor framing.  The clay tile floor/ceiling system appear to have been subject to moisture and is exhibiting clay tile deterioration and rusting steel. | 2-14, 2-15, 2-16, 2-17 |
| 4-2. Steel beam failure | | Steel beams, embed into the concrete walls support the chase sanitary pipes.  Most steel beams exhibit extreme oxide jacking (failure), deterioration and delamination.  HTA has recommended that the pipes be shored. | 4-14, 4-15, 4-16 |
| 4-4. Service chase ceiling deterioration | Concrete Ceiling above lowest chase level | Concrete ceiling exhibits mild to extreme slab reinforcement steel corrosion and concrete delamination due to water infiltration. | 4-10, 4-11, 4-12 |

Exhibit 2 (HTA Report) at 5-12 (designated "red" level repairs taken from Tables 1-4 in the HTA Report). To date, the only repairs Class Members have been made aware are those recommended by Mr. Kaskel and HTA to the quarter house showers.

IDOC's failure, over the past two years, to take any action to address these expert-identified structural issues requiring "immediate attention" has put Class Members at risk of their physical safety.

### 2. Due to IDOC's Lack of Action, Concrete Fell from the Window Lintel Near the Ceiling of E-House in August 2023

These failures have already had consequences. Indeed, the failure to address the window lintels that HTA identified in January 2022 resulted in a foreseeable and preventable harm of concrete falling. In August 2023, a chunk of concrete dislodged from the window lintel in E-House and fell from nearly the ceiling to the floor. Exhibit 4 (Declaration by Anthony Ehlers) at ¶¶14-16. The concrete fell just feet from a correctional officer. *Id.* at ¶15. The following day, another piece of concrete fell in E-House about five feet away from then Class Member, James Soto. Exhibit 5 (Declaration by James Soto) at ¶¶4-5.

### 3. All the Window Lintels in the Four Cell Blocks of the Quarter House Create a Risk of More Falling Concrete

In October 2023, Defendants' expert EXP U.S. Services, Inc. ("EXP") performed an "emergency" evaluation of the concrete lintels in the B, C, D, and E-Houses. Exhibit 6 (EXP Report) at 1. EXP found that there has been ongoing "lintel spalling and cracking . . . for an extended period of time" in all four quarter houses, with E-House showing the "most advanced levels of damage." *Id.* at 2. Specifically, likely due to "significant volumes of water" infiltrating the exterior wall system, many of the lintels in E-House were "severely cracked with whole pieces of concrete having already detached," and their steel reinforcements "exposed . . . and severely corroded." *Id.* Moreover, EXP's assessment indicates that the masonry is also cracking above in the brick above the lintel, which "may provide a secondary pathway for water to infiltrate the system and reach the . . . lintels." *Id.*

Accordingly, EXP identified a risk of falling concrete debris in the quarter houses requiring immediate action. Exhibit 6 (EXP Report) at 2. EXP suggested a stop-gap measure of installing netting, but it does not entirely eliminate the risk of falling debris. *Id.* Moreover, further repairs are required to stop water from continuing to enter the exterior masonry. *Id.* at 4. Defendants opted for a temporary, wooden stop-gap measure, which was installed last spring. Exhibit 7 (Muhammad Declaration) at ¶11; Exhibit 4 (Ehlers Declaration) at ¶¶18-19.

### 4. The Quarter House Continues to Deteriorate and Suffer Water Infiltration

One of the key factors that both Mr. Kaskel and HTA identified as posing a risk to structural integrity of the quarter house was the fact that that the water barriers were compromised, and so water infiltrates the walls, structure, and foundation. Exhibit 1 (Kaskel Report) at 15; Exhibit 2 (HTA Report) at 11. Because those repairs have not been made, Class Members continue to report that water seeps into the building structure when it rains and is observable on the walls and floors. *See, e.g.*, Exhibit 5 (Declaration of James Soto) at ¶¶7-9 (explaining that "[w]hen I resided in E-House last year, I was able to observe water coming through ceiling and walls of E-House that face the yard whenever it rained," observe it condense on the ceiling, and "when it rained, the electricity in my cell on seventh gallery in E-House would go out"); Exhibit 8 (Declaration of Joseph Dole) at ¶¶7-8 (noting that for hours "water r[a]n *inside* after the rain outside stopped," leaving "concrete walls and floors . . . wet"); Exhibit 4 (Ehlers Declaration) at ¶¶22-24 (recounting his observations of "water run down the interior walls," "water pooling inside," and electrical outages during rainstorms); Exhibit 7 (Muhammad Declaration) at ¶14 ("When it rains, I am also able to observe water on the inside walls.").

### 5. Gymnasium is out of Service

Water has infiltrated and collected in the gymnasium roof. Exhibit 1 (Kaskel Report) at 7. Mr. Kaskel observed water stains indicating leaks, as well as splits in the roof, and he recommended replacing the roof if moisture is found within it. *Id.* He assessed that the gymnasium roof is beyond the ability to repair. The building has not been in use by Class Members for years. Exhibit 8 (Dole Declaration) at ¶10.

### 6. The Kitchen and Dietary Building Needs Immediate Repairs

The kitchen and dietary building, where Class Members cook and eat some of their meals, is "in dire need of repair and replacement," according to IDOC's Acting Director Latoya Hughes ("IDOC Director"). Exhibit 9 (IDOC Recommendation to COGFA, dated April 26, 2024 ("IDOC Recommendation")) at 5. According to IDOC and a survey that was conducted, "extensive roofing repairs and masonry work is needed" to the rotunda building that comprises of the kitchen and dietary building. *Id.* at 5 (stating an estimated $3 million is needed for replacement of the roof). In addition, the kitchen building requires "floor replacements, equipment replacement, new ventilation, and freezers and coolers." *Id.* And, perhaps most importantly for a kitchen used for daily meal preparation, the "fire suppression system is beyond its useful life and needs replacement." Exhibit 9 (IDOC Recommendation to COGFA) at 5 (stating estimated cost for kitchen repairs was $15 million). Beyond that, Class Members report that there are no working sinks for workers to wash their hands, and there are rodents in the kitchen. Exhibit 7 (Muhammad Declaration) at ¶¶45, 47.

### B. The CGL Report Confirms Stateville Must Close

In May 2023, IDOC contracted a third party, CGL, to conduct an assessment of Stateville, along with other IDOC facilities. Exhibit 10 (CGL Report) at 1. Overall, CGL found that Stateville's facilities were in such disrepair that they approached CGL's "Inoperable" rating, and

the prison had the lowest "Building Conditions Index (BCI)" among all evaluated IDOC facilities. *Id.* at 4, 38-40. Specifically, 11 of Stateville's buildings showed "complete degradation, inoperability, and need for replacement." *Id.* at 40. In addition to the "extremely poor" structural conditions of Stateville, CGL found it "nearly impossible" for the facility to maintain a constant ambient temperature. Exhibit 10 (CGL Report) at 44. And Stateville did not meet CGL's operational assessment—again scoring lowest among all IDOC facilities. *Id.* at 43. As such, the CGL report admonished IDOC to "[r]eplace Stateville [h]ousing" because it is "not suitable for any 21st century correctional center." *Id.* at 6, 120; *see also id.* at 44.

### C.  IDOC Does not Dispute The Significance of the Structural Issues at Stateville

IDOC does not dispute these structural problems, nor can it. On March 15, 2024, Governor Pritzker and IDOC announced plans to close and rebuild Stateville. Exhibit 11 (Governor Pritzker Press Release Announcing Closing of Stateville dated March 15, 2024). On April 26, 2024, IDOC submitted its recommendation to the Commission on Governmental Forecasting and Accountability ("COGFA") that acknowledged the structural risks that Class Members face due to the repairs needed to the quarter house and kitchen buildings. Exhibit 9 (IDOC Recommendation to COGFA). At a townhall on June 11, 2024, IDOC explained its plan was to transfer Class Members to other IDOC facilities in September 2024. Exhibit 12 (6/11/24 Townhall Tr.) at 89:6-21. In addition, as of June 15, 2024, the State completed the legislative requirements for closing a prison in Illinois.

While Class Members agree with Governor Pritzker's decision and IDOC's plan to close Stateville, Class Members cannot wait the additional months before moving. Nor can they wait for another piece of concrete to fall. The life-threatening conditions that Class Members are exposed to require an immediate transfer.

## II.     Other Conditions Pose Serious Health and Safety Risks to Class Members

The decaying structure of Stateville also prevents it from withstanding extreme temperatures—which have become more extreme and have been occurring more frequently in recent years—due to its structural integrity issues. The quarter house already has compromised ventilation due to the structure's age, but it also has limited access to windows that open; poor circulation of the air; and/or fans that were not working, not turned on, or locked. Exhibit 7 (Mohammad Declaration) at ¶11 ("Some of the windows in E-House are now nailed shut and/or blocked from opening due to the materials that were put up to prevent more concrete from falling from the windows. The barriers to protect us from the structural risk are causing restriction of airflow in E-House. . ."); Exhibit 4 (Ehlers Declaration) at ¶9 (barriers put up prevent some windows on the front wall of E-House from being opened); *id.* at ¶11 ("Even before [the new barriers] few windows were able to open or open fully in E-House."). During the hot days, Class Members are exposed to excessively hot temperatures, particularly on the higher galleries. Exhibit 13 (Declaration of Taurean Dectur) at ¶5 (exposure to extreme heat in E-House due to lack of ventilation and "windows above the catwalk are closed and nailed shut."); Exhibit 14 (Curry Declaration) at ¶¶15-19 (many windows remain "nailed shut"); Exhibit 15 (Declaration of Robert Cloutier) at ¶¶9-12 ("It is oppressively hot in Stateville. . . ."); Exhibit 5 (Soto Declaration) at ¶¶10-15.

Although Stateville has long dealt with "[o]ngoing pest control issues," Class Members must compete with birds and vermin because of the unsound walls. Exhibit 16 (IDOC December 2022 Safety & Sanitation Report) at 3, 5; Exhibit 17 (IDOC November 2022 Safety & Sanitation Report) at 3, 5; Exhibit 18 (IDOC October 2022 Safety & Sanitation Report) at 3-4; Exhibit 19 (IDOC September 2022 Safety & Sanitation Report) at 3-4, 6-8; Exhibit 20 (June 2019 Sanitation Report) at 5-7; Exhibit 3 (Ehlers Declaration) at ¶44 ("There are birds flying all around, dropping

10

excrement throughout the cellhouse."). Class Member Joseph Dole recalled that after Class Members were permitted to reinhabit E-House after the barriers were erected on the window lintels after concrete fell in August 2023, he observed that in the weeks of absence, the floors, beds, and sinks in E-House were "covered in bird feathers and excrement." Exhibit 8 (Dole Declaration) at ¶22.

Class Members also fear drinking the water in the faucets due to particles in it, discoloration and odor; and, so they do not. Exhibit 4 (Ehlers Declaration) at ¶¶39-40 ("The water here is undrinkable; it is discolored and has particles in it. I also believe it has other harmful substances and I fear drinking it. I do not observe staff drinking the water from the faucet either. I observe staff bringing in water from the outside and/or drinking from bottles of water."); Exhibit 7 (Muhammad Declaration) at ¶44 (due to the color and odor of the water and "the particles in it and contaminants," he does not feel safe drinking the water and does not observe staff doing so); Exhibit 15 (Declaration of Robert Cloutier) at ¶13 (same).[5]

## III.    The Conditions Present and Immediate Risk to Class Members

Consistent with the evaluations of Stateville, Class Members face risks of grave injury. In the past, a portion of the shower ceiling in Edwards House collapsed on a Class Member. Exhibit 4 (Ehlers Declaration) at ¶21. Moreover, Class Members have reported that the ceiling in the commissary is falling down. Exhibit 8 (Declaration of Robert Dole) at ¶9; Exhibit 7 (Muhammad Declaration) at ¶6. IDOC has also recognized these looming threats to Class Members' health and

---

[5] Other Class Members submitted letters of support reporting on some of these conditions. See, e.g., Exhibit 13 (Decatur Declaration) (describing leaking walls, electrical problems when the cell house floods, birds, bugs and lack of ventilation); Exhibit 21 (Statement of Bryan Dean) (structural damage, vermin and ventilation). See also Exhibit 23 (Statement of Justice Cavazos); Exhibit 22 (Statement of Lynn Green).

safety, noting that the prison is *currently* too dangerous for people to live in. Exhibit 12 (6/11/24 Townhall Tr.) at 5:17-6:13, 14:8-12.

Indeed, tragically last month, Class Member Michael Broadway, died in his cell in E House, which was located on the highest gallery and occurred on a hot and humid day, where Class Members reported excessive heat and poor ventilation. Exhibit 4 (Ehler Declaration) at ¶¶30-37 (describing the excessive heat on the gallery of Mr. Broadway's cell the day he died and his tragic death); Exhibit 8 (Dole Declaration) at ¶¶11-14 (attesting to the heat experienced on the high galleries during heat waves); Exhibit 15 (Cloutier Declaration) at ¶¶22-31 (describing his witnessing his Michael's tragic death).

Although some repairs have been made at Stateville, the facility continues to be extremely dangerous. The structural damage and disrepair to Stateville's many compromised buildings pose an ongoing risk to Class Members, as well as those employed there. IDOC has recognized these looming threats to Class Members' health and safety, noting that the prison is *currently* too dangerous for people to live in. Exhibit 12 (6/11/24 Townhall Tr.) at 5:17-6:13, 14:8-12.

## IV. Defendants' Inadequate Response and the Need to Move Class Members Now

As discussed above, the parties agree that Stateville is unsafe. IDOC has failed to ensure the safety of Class Members with respect to the deterioration of Stateville. Since January 2022, IDOC has failed to address five of the red-level, "immediate action" required that HTA identified in structural repairs to ensure the structural safety of the quarter house. Exhibit 2 (HTA Report) at 5-12 (Tables 1-4).

In all, IDOC has allowed $250 million in necessary repairs to amass. Exhibit 5 (IDOC Recommendation to COGFA) at 2. For instance, last May, CGL reported that Stateville needed 12 million dollars of immediate repairs. Exhibit 10 (CGL Report) at 120. IDOC has also identified

12

another 18 million dollars needed to make necessary repairs to the kitchen roof and building, including to its fire suppression system." Exhibit 9 (IDOC Recommendation to COGFA) at 5.

Class Members live in fear of illness, injury, and death. They are surrounded by safety hazards and have witnessed Stateville's dangers firsthand. Class Members fear that the discolored water is harmful to their health. Exhibit 8 (Dole Declaration) at ¶13. Some have observed concrete falling within five feet of where they were walking. Exhibit 5 (Soto Declaration) at ¶14. Others must frequently walk past falling debris and large cracks in the walls, and report, "I fear that concrete will fall on me." Exhibit 7 (Mohammad) Declaration at ¶¶20-22. Those who witnessed Michael Broadway's tragic death have said, "I fear that my fate will be the same as Michael's if I continue to live in these conditions." Exhibit 15 (Cloutier Declaration) at ¶31. Their fears are real and inescapable.[6]

But Class Members are not the only ones who know how dangerous Stateville is. IDOC's Director said herself that closing Stateville during the rebuild is critical for the safety and well-being of Class Members and employees. Exhibit 12 (6/11/24 Townhall Tr.) at 13:25-14:7

It would not be a burden to transfer Class Members immediately. IDOC's Director said that concerns about closing Stateville during the rebuild are "unfounded". *Id.* Stateville's current population is a fraction of what its capacity is. IDOC's website reports that the population as of the date of this filing is 422 individuals and the total capacity for the facility is 3,020. *See* Charles

---

[6]      Class Members report that the State has stopped investing in quality care for the living and common areas, and that since Governor Pritzker announced the impending closure of Stateville, staff has stopped coming to work or has refused to do their jobs while at the prison, leaving Class Members to suffer in abject conditions. Exhibit 7 (Muhammad Declaration) at ¶¶48-51 (since Governor Prizker's announcement, he has observed an increase in the number of days where staff shortages are provided as basis Class Members have reduced access to time outside their cells, such as for yard); Exhibit 8 (Dole Declaration) at ¶¶24-26 (yard and school cancelled in recent months due to under staffing); Exhibit 15 (Cloutier Declaration) at ¶8 (since the closure announcement the only repairs observed at the facility have been to the building where correctional officers eat).

Truitt, *Stateville Correctional Center: Facility Data*, Ill. Dep't of Corr., https://idoc.illinois.gov/facilities/allfacilities/facility.stateville-correctional-center.html (last visited July 30, 2024). IDOC already has plans to relocate many Class Members: Approximately one-fifth of the Class Members currently in Stateville have been slated for transfers (to access certain educational programming).[7] *Id.* at 12:18-25.[8] Because IDOC has known about and planned for the transfer of Class Members out of Stateville, there are spaces already available at other facilities. Most notably, the current population at Sheridan Correctional Center is 1,210 while its reported operational capacity is 2,107, which indicates that there is space available at that facility. *See* Ryan Woods, *Sheridan Correctional Center: Facility Data*, Ill. Dep't of Corr., https://idoc.illinois.gov/facilities/allfacilities/facility.sheridan-correctional-center.html (last visited July 30, 2024).

## V.     Class Members Need Immediate Relief

The Defendants' failures to adequately respond to the significant health risks in Stateville have had, and will continue to have, devastating effects on the Class Members of Stateville Correctional Center. Absent the immediate closure of Stateville, those residing and working in the facility faces severe, ongoing risks of grievous bodily injury or death.

---

[7] Of the current population of approximately 420 Class Members, 80 Class Members are part of Northwestern University's Prison Education Program ("NPEP") and were previously approved for transfer to Sheridan Correctional Center to continue their educational programing in September 2024. Those 80 Class Members should be permitted to transfer as part of the prior agreement with IDOC regardless of the outcome of this motion. Director Hughes identified this agreement at the June 11, 2024 Townhall meeting. Exhibit 12 (6/11/24 Townhall Transcript) at 12:18-25 ("Of the 431 individuals in custody impacted at Stateville, approximately 80 of those individuals in custody were already previously identified for transfer from Stateville, specifically to continue their educational pursuits in the Northwestern Prison Education Program, which was slated to mov to Sheridan Correctional Center, even prior to this process.").

[8] *See also* Exhibit 10 (CGL Report) at 27 (noting that Stateville has an "exceedingly high" vacancy rate).

**LEGAL STANDARD**

On a motion for a preliminary injunction, the plaintiffs must establish that they are "likely to succeed on the merits" and that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (preliminary injunction).

This is not a high burden. A party seeking a preliminary injunction "need only establish a 'trivial chance of succeeding on the merits.'" *Frullari Franchise Sys., Inc. v. Dana Areece & Co.*, 2001 WL 743427, at *2 (N.D. Ill. June 28, 2001) (quoting *Green River Bottling Co. v. Green River Corp*, 997 F.2d 359, 361 (7th Cir. 1993)); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (explaining that a party seeking a preliminary injunction must "only show that his chances to succeed on his claims are better than negligible" (internal quotation marks omitted)).

If the movant meets their burden to show a that they have some likelihood of succeeding on the merits of their claim, the court must consider the irreparable harm to nonmoving party would suffer if the preliminary injunction is granted, and balance that harm against the irreparable harm that the movant would face if the injunction was *not* granted. *Ty, Inc.*, 237 F.3d at 895. Such a balancing process involves a "sliding scale" approach, wherein the more likely a movant is to win on the merits, the less the balance of harms must weigh in their favor, and vice versa. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020); *see also Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 847 (N.D. Ill. 2019); *Hoosier Energy Rural Elect. Co-op, Inc. v. John Hancock Life Ins. Co.*, 583 F.3d 721, 725 (7th Cir. 2009). The court must also consider the public

interest when determining whether to grant the preliminary injunction. *Foster v. Ghosh*, 4 F. Supp. 3d 974, 984 (N.D. Ill. 2013).

Courts have broad power to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). And although courts must "be sensitive to the State's interest[s]" in imprisonment, they "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners [and] . . . may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam) (internal quotation marks omitted)). As federal courts have recognized, there are obvious scenarios where the transfer of prisoners is necessary to protect their constitutional rights, such as cases where a prison is "so dilapidated that no one could predict when the walls would crumble down, thus putting inmates' lives at serious risk." *Plata v. Brown*, 427 F. Supp. 3d 1211, 1223 (N.D. Cal. 2013).

For prospective relief of prison conditions, the Court's relief "shall extend no further than necessary to correct the violation of the Federal right". 18 U.S.C. § 3626(a)(1)(A). The relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* In addition, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

## **ARGUMENT**

The Court should grant the Class Members' motion. Their request meets each requirement for a preliminary injunction as set forth below.

I. **Class Members Can Demonstrate a Reasonable Likelihood of Success on the Merits**

Class Members are reasonably likely to succeed on the merits of their claims by demonstrating that their current conditions of confinement violate the Eighth Amendment.

A. **Deliberate Indifference Requires Showing of Awareness of a Risk and an Unreasonable Response to that Risk**

To establish an Eighth Amendment violation, Class Members must show two things. First, they must "demonstrate that the deprivation suffered was, objectively, 'sufficiently serious,'" meaning that "the prison official's act or omission . . . result[ed] in the denial of the minimal civilized measure of life's necessities." *Williams v. Shah*, 927 F.3d 476, 479–80 (7th Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, the Class "must demonstrate that the prison official had a sufficiently culpable state of mind," namely "deliberate indifference to inmate health or safety." *Williams*, 927 F.3d at 480 (citing *Farmer*, 511 U.S. at 834). This includes a deliberate indifference to conditions posing "an unreasonable risk of serious damage" to Class Members' present health, as well as conditions threatening their "future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (considering exposure to secondhand smoke). Class Members have met this standard.

Class Members are entitled to the "minimal civilized measure of life's necessities," such as adequate shelter, sanitation, and physical safety. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997); *see also Teen v. St. Clair Cnty. Jail*, 2017 WL 3670164, at *7 (S.D. Ill. Aug. 25, 2017). Here, IDOC failed to provide Class Members with minimal necessities, "including adequate shelter." *Dixon*, 114 F.3d at 642. Both the Court's and the Defendants' expert acknowledge that Stateville is falling apart. Exhibit 1 (Kaskel Report); Exhibit 2 (HTA Report); Exhibit 10 (CGL Report) at 120; *see also* Exhibit 7 (Mohammad Declaration) at ¶¶6, 9 (noting that the ceiling in the commissary is falling down). Indeed, Class Members have viscerally felt the facility's decay,

17

witnessing falling concrete, and water permeating the structure when it rains. *See, e.g.*, Exhibit 4 (Ehler Declaration) at ¶21 (observed concrete fall on Class Member in E-House shower); Exhibit 7 (Mohammad Declaration) at ¶11; Exhibit 4 (Soto Declaration) at ¶4 (observed concrete fall near him shortly the day after concrete fell from the E-House window lintel). IDOC's Director recognized that ignoring these issues only exacerbates risks to both Class Members and staff. Exhibit 9 (IDOC Recommendation to COGFA) at 8-9. Since Defendants have failed to address these life-threatening risks, Class Members must ask the Court to intervene.

Courts have repeatedly found that risk to the physical safety of prisoners violates the Eighth Amendment. *See, e.g.*, *Helling*, 509 U.S. at 33 ("The [Eighth] Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 200 (1989)); *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981) ("Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement, and conditions in a number of prisons, especially older ones, have justly been described as deplorable and sordid." (internal quote marks and citation omitted)); *Cody v. Hillard*, 799 F.2d 447, 449-50 (8th Cir. 1986), *on reh'g*, 830 F.2d 912 (8th Cir. 1987) (affirming, following *Rhodes*, where the "cells lacked adequate ventilation, and other cells lacked running hot water."); *Isaac v. Cockrell*, 2018 WL 4679762, at *3 (E.D. Mich. Sept. 28, 2018) ("The Eighth Amendment . . . prohibits punishments that deprive detainees of the minimal measure of necessities . . . . [which] include[s] reasonably adequate ventilation." (citations omitted)); *Gregory v. Davis*, 2015 WL 128061, at *1 (S.D. Ill. Mar. 18, 2015) (concluding that alleged "exposure to asbestos-covered pipes and mold," leaking "toilet[s] and pipes," "inadequate" ventilation, and "an infestation of bugs" constitute eighth amendment violations); *Moore v. Smith*, 2021 WL 11716912, at *5 (M.D. Ga. Mar. 3, 2021) (finding that exposure to black mold can

constitute an Eighth Amendment violation); *James v. Milwaukee Cnty.*, 956 F.2d 696, 699 (7th Cir. 1992) (explaining that a "deprivation[]" of "physical safety" violates the Eighth Amendment); *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) (similar); *Smith v. Clark*, 1992 WL 222603, at *3 (N.D. Ill. June 21, 1993) ("Deprivations of basic human needs, such as a prisoner's physical safety, are actionable [under the Eighth Amendment]."); *Sardon v. Peters*, 1995 WL 609147, at *7 (N.D. Ill. Oct. 13, 1995) ("[A] deprivation of a basic human need such as . . . physical safety . . . is required to find an Eighth Amendment violation.").

As the Supreme Court explained in *DeShaney*:

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

489 U.S. at 200.

The Seventh Circuit has further recognized that incarcerated people are entitled to "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (quoting *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016)); *see also Roman v. Hileman*, 2018 WL 3045622, at *5 (S.D. Ill. June 20, 2018) ("[A] prisoner's right to adequate and healthy ventilation has been recognized as necessary to meet constitutional requirements."); *Sherman v. Lane*, 1998 WL 11649, at *6 (N.D. Ill. Mar. 9, 1998) ("Prisoners must be provided with adequate heat and ventilation.") *Thomas v. GEO Grp., Inc.*, 2022 WL 834333, at *10 (N.D. Ind. Mar. 21, 2022) ("[I]nmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation." (citing *Knight v. Wiseman*, 509 F.3d 458, 463 (7th Cir. 2009)); *Famous v. Pollard*, 2008 WL 152926, at *3 (E.D. Wis. Jan. 11, 2008) (explaining that conditions producing "the deprivation of a single, identifiable human need such

19

as food, warmth, or exercise" constitutes actionable harm under the Eighth Amendment) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Courts within the Seventh Circuit have regularly granted motions for preliminary injunctions when incarcerated individuals allege unsafe conditions. *E.g.*, *Winters v. Hendrix*, 2023 WL 7553861, at *2, *6 (N.D. Ill. Nov. 13, 2023) (granting the plaintiff's motion for injunctive relief pursuant to his Eighth Amendment claim against the warden for unsanitary drinking water); *Henderson v. Butler*, 2015 WL 6746581, at *5 (S.D. Ill. Nov. 5, 2015) (concluding that the plaintiff's Eighth Amendment claim survives a motion to dismiss when the plaintiff "allege[d] that he notified [the correctional officers] about soaring temperatures, denial of a fan," and hygienic issues, and the officers failed to take any steps to address these conditions).

### B. Class Members Are Reasonably Likely to Succeed on their Eighth Amendment Claim

Class Members are reasonably likely to succeed on their claim, thus satisfying the first requirement of a preliminary injunction. While any one of the conditions at issue in this lawsuit, on its own, violates the Eighth Amendment, Class Members face significant and substantial risk to their health and safety due to the structural deterioration of the facilities, including most critically of the buildings where Class Members reside and spend nearly all their time—the quarter houses and the kitchen and dietary building where meals are prepared and served. *See generally* Exhibit 1 (Kaskel Report) & Exhibit 2 (HTA Report). The Governor and IDOC has announced a plan to decision to close and rebuild Stateville and stated that there is an "urgent need to act now [which] drives the administration's decision to close and rebuild Stateville rather than to repair it," Exhibit 12 (6/11/24 Town Hall Tr.) at 5:17-6:4. However, IDOC has failed to implement the

transfer of Class Members and in the meantime have failed to make the necessary measures to ensure their physical safety.

Class Members can demonstrate that they can satisfy the legal threshold to support the Court ordering the transfer of Class Members to commence as soon as possible and to have all Class Members transferred or released by September 20, 2024.

The evidence in support is overwhelming. First, the Court's appointed expert, Bruce Kaskel, of inspected the quarter house in September 2019 and issued a report documenting the significant concerns related to cracks in the exterior masonry and interior masonry that needed further inspection due to possible compromise to the structural integrity of the building. Exhibit 1 (Kaskel Report). In response, IDOC hired its own expert to inspect the masonry of the quarter house in response. Exhibit 2 (HTA Report). IDOC's own expert identified that there due to "numerous elements" including the masonry walls, arches and roof, have failed as "a water barrier." Exhibit 2 (HTA Report) at 1. Back in 2022, IDOC's own expert recommended that "masonry cracks present in and near the north and south arches [of the quarter house] require **immediate attention.**" Exhibit 2 (HTA Report) at 1 (emphasis added). Class Members have received no indication that those repairs were ever conducted to date.

In addition, back in 2022, IDOC's expert also indicate that "wall cracking and top of wall cracking is present throughout the [quarter house] and requests repairs." Exhibit 2 (HTA Report) at 1. HTA further identified that "[a] few concrete lintels over large windows show signs of deterioration" and required assessment. *Id.* Indeed, nothing was done and as a result, in August 2023, a section of concrete fell from nearly the ceiling in E-House from the window lintel. Exhibit 6 (EXP Report) at 1. Class Members present in the facility at that time witnessed the falling concrete, which fell within feet of a correctional officer. Exhibit 4 (Ehlers Declaration) at ¶¶14-

21

16. An engineering firm examined the window lintels and concluded that "all four cell blocks have some level of lintel spalling and cracking which has been ongoing." Exhibit 9 (IDOC Letter to COGFA) at 5. Although barriers have been placed over the walls in the quarter house to prevent additional concrete from falling, nothing has been done to conduct the extensive repairs needed to fix the window lintels in the quarter house.

Further, IDOC's expert identified that "[s]ignificant oxide jacking is present in most of the steel due to water migration" in the service wall chase behind all the cells in the quarter house. Exhibit 2 (HTA Report) at 2. As a result, there are additional cracks in the walls, concrete slab delamination, and rebar rusting. Back in 2021, IDOC's expert stated that the service wall chase "required **immediate attention.**" Exhibit 2 (HTA Report) at 2. Class Members are not aware of any repairs made to the service wall chase since IDOC's expert made this recommendation in 2021.

Then, in June 2023, IDOC's third-party vendor issued its report for all IDOC facilities, which concluded that Stateville is "not suitable for any 21st century correctional center." Exhibit 10 (CGL Report) at 120. CGL further concluded that Stateville requires "an estimated $12 million in **immediate structural repairs.**" *Id.* (emphasis added). Again, as of this filing, none of the estimated immediate repairs identified by CGL have been made.

Second, Class Members routinely contend with sweltering heat, debris-filled air, and scarce ventilation. *E.g.*, Exhibit 15 (Cloutier Declaration) at ¶¶9-12; Exhibit 7 (Declaration of Mohammad) at ¶¶24-29; Exhibit 4 (Ehlers Declaration) ¶¶25-27; Exhibit 8 (Dole Declaration) at ¶¶11-16; Exhibit 14 (Curry Declaration) at ¶¶15-21. Stateville's decrepit structure is unsuitable for the extreme heat of Illinois summers. The facility's walls fail to insulate Class Members from the heat, and windows are either sealed shut or rendered inoperable because of other structural damage.

22

*See, e.g.*, Exhibit 4 (Ehlers Declaration) at ¶¶9, 11-12 (explaining that windows are locked or "blocked to prevent concrete from falling"); Exhibit 14 (Curry Declaration) at ¶18.

Finally, the collapsing structure of Stateville invites pests, such as vermin and birds, as well as mold, to live amongst Class Members. Rats and roaches reside in the kitchen, while birds fly throughout the quarter houses, leaving feathers and excrement allover Class Members' cells. *See, e.g.*, Exhibit 8 (Dole Declaration) at ¶¶21-23; Exhibit 7 (Mohammad Declaration) at ¶47. Moreover, the prison's cracked walls and decaying ceiling provides an optimal breeding ground for mold. Class Member Mr. Cloutier, for example, reported that one of the commissary rooms is unusable because "it is too decayed" and covered with black mold. Exhibit 15 (Declaration of Cloutier) at ¶7.

As such, the Class Members surpass the showing required for preliminary injunctive relief—namely, that their chance of success on the merits is greater than "trivial" or "negligible." *Frullati Franchise Sys.*, 2001 WL 743427, at *2; *Whitaker*, 858 F.3d at 104.

The ongoing health and safety threats by the physical buildings combined with poor ventilation, and unsanitary water create an "intolerable" and unlivable environment that constitutes cruel and unusual punishment. *See Dixon*, 114 F.3d at 642; *see also Helling*, 509 U.S. at 33 ("It is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions.'") (quoting *Youngberg v. Romero*, 457 U.S. 307, 315–16 (1982)). Class Members are entitled to life's minimum necessities. The conditions in Stateville are not merely "harsh and uncomfortable." *Dixon*, 114 F.3d at 642. They are deadly. Plaintiffs are therefore likely to succeed on their claims under the Eighth Amendment.

## II. The Class Members Have No Adequate Remedy at Law for the Severe Risk of Injury or Death They Continue to Face

Injunctive relief is warranted now, even in light of IDOC's public statements that it intends to start moving Class Members in September, for three reasons. First, IDOC has not provided a date specific in September, nor has IDOC guaranteed that the transfers will actually start in September. Second, IDOC has never represented that *all* Class Members will be out of the facility during the month of September. Accordingly, IDOC may take additional weeks and/or months to complete the evacuation of all Class Members from the facility posing additional, and unnecessary, amount of time that exposes Class Members unnecessarily to risk to their physical safety and health. Accordingly, starting transfers out of the facility during the next few weeks, even if on only a rolling basis, will greatly reduce risk to Class Members.

Injunctive relief is proper "when the plaintiff has no adequate remedy at law, such as monetary damages." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). Conditions that "pose an immediate threat to the health and safety" of Class Members "have no adequate remedy at law." *Young v. Ballis*, 762 F. Supp. 823, 837 (S.D. Ind. 1990); *see also Flynn*, 830 F. Supp. 2d at 992 (finding that plaintiffs have no adequate remedy at law and "that only injunctive relief will alleviate the risks at which they are placed by the defendants' acts and omissions").

Everyone inside of Stateville faces substantial risks of serious injury or death for which there is no adequate remedy at law. The structures are on the brink of collapse—and have indeed begun to collapse on Class Members (and put staff at risk). The longer that Stateville is allowed to remain open, the larger these life-threatening risks loom. Accordingly, "because the risk of harm to plaintiffs is a grave threat to their health and possibly their lives, they have shown a risk of harm

24

for which 'it is not practicable to calculate damages' and therefore has no adequate remedy at law." *Mays v. Dart*, 435 F. Supp. 3d 1074, 1098 (N.D. Ill. Apr. 9, 2020).

## III. The Class Members Face Irreparable Harm, Including Death, Absent Temporary and Preliminary Relief

Irreparable harms are those which "cannot be undone following the adjudication and a final determination of the merits of [the plaintiff's] underlying claim." *Foster*, 4 F. Supp. 3d at 983. They include "an injury that is not easily measurable in monetary terms," such as physical pain or injury to reputation. *EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 845 (N.D. Ill. 2001); *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 682 (7th Cir. 2012).

The risks Class Members face are sufficient to establish a likelihood of irreparable harm to support injunctive relief. *E.g.*, *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (finding irreparable harm that the plaintiff cannot be "prevented or fully rectified by the final judgment after trial"); *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (irreparable harm is that which "cannot be repaired and for which money compensation is inadequate" (internal quotation marks omitted)); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Courts in this circuit have explained that "pain, suffering, and risk of death constitute irreparable harm sufficient to support a preliminary injunction in prison cases." *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001); *see also Flynn*, 630 F. Supp. 2d at 992-93 (explaining that absent injunctive relief, plaintiffs "will suffer irreparable harm in the form of continued medication errors and delays" which create "life-threatening risks . . . and unnecessary pain and suffering").

IV.    **The Harm Threatening Class Members Outweighs Any Harm to Defendants**

When balancing equities, the Court "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). In doing so, courts in this circuit employ a "sliding scale" approach, wherein the more likely the movant is to succeed on the merits, the less they need the balance of harms to weigh in their favor to receive injunctive relief. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

Here, the Class Members are both likely to succeed on the merits of their Eighth Amendment claims and have the equities balancing in their favor. They continue to live in substandard conditions and risk grievous injury or death every day. The harms to Defendants, in contrast, are purely administrative and negligible. Although Defendants may expend additional time or funding to immediately move Stateville Class Members, such expenditures hardly constitute actual harms.[9] The current delay from implementing the transition out of Stateville is unnecessarily putting Class Members at risk for no compelling reason. That is especially true given that the COGFA process has been completed and no statutory impediment exists to commence transfers of Class Members immediately.

Yet even if there were actual "harms" to Defendant, which they are not, they would pale in comparison to the severe risks to life and limb that Class Members face on a daily basis. Indeed, the Supreme Court has long recognized that "vindication of concede conditional rights cannot be made dependent upon any theory that it is less expensive to deny them than to afford them."

---

[9]    To the extent that there are any additional expenditures, IDOC has also pledged to minimize the disruption of relocating Class Members to other facilities. Exhibit 12 (6/11/24 Town Hall) at 15:11-25.

*Watson v. City of Memphis*, 373 U.S. 526, 537 (1963). And courts in this circuit have readily acknowledged that "matters of administrative concern," such as "budgetary concerns," must "ultimately give way when constitutional rights are in jeopardy." *Flynn*, 630 F. Supp. 2d at 993; *Tay v. Dennison*, 457 F. Supp. 3d 657, 688 (S.D. Ill. 2020) (finding that the balance of harms "tips in Plaintiff's favor," as granting injunctive relief only "direct[s] Defendants to do their job"). Other federal courts have likewise held even the State's attempt to mitigate dangerous prison conditions, such as severe heat, are "insufficient to combat the substantial risk of serious injury or death faced by inmates." *Cole*, 2017 WL 3049540, at *10; *see also Valentine v. Collier*, 455 F. Supp. 3d 308, 328 (S.D. Tex. 2020) (finding that the balance of equities tilt in plaintiffs' favor because they "face serious irreparable harm—including severe illness, long-term health effects, and possibly death— if forced to remain in the current condition" of the prison, while defendants' "countervailing contention is that they will suffer an institutional injury").

While an injunction would impose some costs on Defendants,[10] they are only the costs of legal compliance. Accordingly, the balance of harms favors Class Members.

## V. A Preliminary Injunction in Favor of Class Members Would Serve the Public Interest

It is always in the public interest to prevent a continuing violation of a plaintiff's constitutional rights. *See, e.g.*, *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely upholding constitutional rights serves the public interest.") (quoting *Newsome v. Albemarle Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)); *Preston*, 589 F.2d at 303. And the State has a "substantial interest in the efficient and safe operation of [its] prison system." *Flynn*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009).

---

[10]     Indeed, at a recent COGFA town hall, IDOC's Director said that it is not fiscally responsible to expend funds now while building a new facility. Exhibit 12 (6/11/24 Town Hall) at 8:15-25. It is better for Class Members *and* IDOC staff, she said, to immediately close the prison, as this is the only way to ensure everyone's safety. *Id.*

Plaintiffs' requested relief is in the public interest because transferring Class Members to other IDOC facilities would ensure that Defendants act in accordance with the law to maintain their prison system. *Cf. Basank, P.G. ex rel. K.G. v. Hamos*, 2013 WL 393233, at *6 (C.D. Ill. Jan. 31, 2013) (granting a temporary restraining order for severely mentally ill children to require the State to provide adequate in-home or alternative care as required by the Medicaid Act). Moreover, the immediate closure of Stateville would benefit the state employees who work in the prison by protecting them from many of the same dangers Class Members face. *Cf. Vantile v. Collier*, 455 F. Supp. 3d 308, 329–30 (S.D. Tex. 2020) (finding that an injunction will serve the interests of the Department of Corrections staff because they, like Class Members, were at risk of contracting COVID-19 from the current prison conditions).

Furthermore, the relief Class Members seek is narrowly tailored in that it orders the relief of transfer by a certain date, but IDOC has discretion about where Class Members will be transferred and can conduct is regular assessments to decide on transfer locations.

## VI. This Court Should Not Require Class Members to Provide Security Prior to Issuing a Temporary Restraining Order

Under Rule 65(c) of the Federal Rules of Civil Procedure, district courts have discretion to determine the amount of the bond accompanying a preliminary injunction. This discretion includes the authority to set a nominal bond. In this case, the Court should waive bond because Plaintiffs are indigent, the requested preliminary injunction is in the public interest, and the injunction is necessary to vindicate constitutional rights. *See Pocklington v. O'Leary*, 1986 WL 5748, at *2 (N.D. Ill. May 6, 1986) ("[B]ecause of [a prisoner's] indigent status, no bond under Rule 65(c) is required.").

28

## CONCLUSION

For the above reasons, Class Members respectfully request that the Court grant their motion for a preliminary injunction and enter an order directing the Illinois Department of Corrections to produce a plan that details the transfer of all Class Members from Stateville to another facility and/or their release by August 12, 2024, and further directs IDOC to transfer and/or release all Class Members from Stateville by no later than September 20, 2024.

Dated: July 31, 2024

Respectfully submitted,

**_DOBBEY_ CLASS MEMBERS**

_/s/ Heather Lewis Donnell_
_One of Plaintiffs' Attorneys_

Michael Kanovitz
Heather Lewis Donnell
Maria Makar
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
mike@loevy.com
heather@loevy.com
makar@loevy.com
_Attorneys for Plaintiffs_